## JACKSON, et al v. CONSOLIDATED GOVERNMENT OF CITY OF JACKSONVILLE.

No. 68-4054.

Circuit Court, Duval County.

August 23, 1968.

C. Ray Green, Jr., Jacksonville, for plaintiffs.

William L. Durden, William H. Adams III and J. Henry Blount, all of Jacksonville, for defendant.

Harold B. Wahl, Jacksonville, amicus curiae.

THOMAS A. LARKIN, Circuit Judge.

*Memorandum opinion and final judgment:* Plaintiffs individually, and as Duval County Commission and Duval County Budget Commission members and purported Democratic nominees for election thereto instituted this action contesting the existence and constitutional validity of article VIII, §9, Florida constitution, hereinafter called the Jacksonville consolidation amendment, and chapters 67-1320, 67-1535 and 67-1547, Laws of Florida, 1967, hereinafter referred to as the Jacksonville consolidation charter, which charter was enacted by the legislature and adopted by the electorate of Duval County pursuant to the consolidation amendment.

Plaintiffs contend in substance that the consolidation amendment to the constitution has heretofore been repealed by a later conflicting amendment to article VIII, §5 thereof, or, in the alternative, that the consolidation charter is unconstitutional and invalid in its entirety for a variety of reasons which shall be hereafter discussed.

Because of the great public importance of this case, I requested and received the assistance of two other judges of this court, the Honorable Marion W. Gooding and the Honorable Henry F. Martin, Jr. Both judges sat during the hearings; I consulted with them from time to time during the hearing and afterwards; however, their participation has been limited to consultation and advice, and the findings and conclusions on this judgment are solely my own.

Prior to the final hearing I reserved ruling on various motions and other questions raised by the parties. My rulings on those questions are incorporated in this judgment.

The references herein to articles and sections of the constitution, refer to the Florida Constitution 1885, as amended, unless otherwise stated.

This court is called upon to determine certain propositions of law upon facts which are largely uncontroverted. The court does not undertake to evaluate the desirability or advisability of the adoption by the legislature and the electorate of Duval County of this form of government. Therefore, nothing in this opinion is to be construed as an expression of the views of this court on that

subject since those matters are not within the scope of proper judicial determination. Dade County v. Dade County League of Municipalities, 104 So.2d 512 (Sup. Ct. Fla. 1958). The initial decision with respect to such matters rested with the legislature and the electorate of Duval County pursuant to the terms of the consolidation amendment to the constitution. Thereafter, the legislature and the electorate of Duval County are vested with authority pursuant to such amendment to alter or abolish any such consolidated municipality and the consolidated charter makes provision for the electorate to amend or change such charter in the future.

### Purported repeal of article VIII, section 9

Plaintiffs first contend that the consolidation amendment no longer exists, because it was impliedly repealed by the later amendment of article VIII, §5, a general section which relates to county commissioners.

The legislature specifically relied on the consolidation amendment in passing the charter. If that section had previously been repealed, it was ineffective to authorize the legislature to enact the charter. Consequently, this issue is the most crucial one in this litigation.

In determining this question, it is helpful and material to consider the setting in which the consolidation amendment was adopted in 1934. Since the original publication of the constitution of 1885, article VIII, §1 thereof has provided that the state shall be divided into political subdivisions called counties, and article VIII, §5 thereof has provided that there shall be five county commissioners in each county. An amendment to §5 in 1900 permitted the county commissioners themselves to divide their respective counties into five commissioners' districts. Consequently, the passage of the consolidation amendment in 1934 authorized the alteration of the existing scheme with respect to counties and county commissioners only in Duval County which was its limited field of operation. Its apparent purpose was to permit a partial or complete departure from such existing scheme within Duval County. Article VIII, §11, was added to the constitution in 1942 and made certain specific provisions with respect to the county commissioners of Dade County, particularly concerning their terms of office and which varied from the provisions of article VIII, §5, with respect thereto. Section 5 was itself amended in 1944 primarily with respect to the county commissioners' terms of office and such amendment specifically provided that it would not affect the previous amendment relative to Dade County concerning relatively the same changes. These subsequent amendments to article

VIII, §5, and article VIII, §11, did not alter the basic scheme with respect to counties and county commissioners so as to cause the consolidation amendment to be any more inconsistent therewith than it already was.

Plaintiff contends that the amendment to article VIII, §5, was a drastic amendment and that its effect was to repeal the consolidation amendment in its entirety. Needless to say, it is possible for one constitutional provision to repeal another, and there is no doubt that this may be done by implication. A new constitutional provision prevails over prior provisions of the constitution (a) if it specifically repeals them or (b) if it cannot be harmonized with them. Nevertheless, it is settled that implied repeal of one constitutional provision by another is not favored, and every reasonable effort will be made to give effect to both provisions. Unless the later amendment expressly repeals or purports to modify an existing provision, the old and new should stand and operate together unless the clear intent of the later provision is thereby defeated. Board of Public Instruction of Polk County v. Board of Commissioners of Polk County, 58 Fla. 391, 50 So. 574 (1909).

The amendment to article VIII, §5, did not specifically repeal any other section of the constitution. Its terms are general. It deals only with county government. It has no relation at all to the special provision authorizing the legislature to create a consolidated municipal government in Duval County. It is difficult to conceive that the legislature or the people could have intended, merely by a small alteration of the powers and the terms of county commissioners, to wipe out the entire constitutional section authorizing a consolidated municipal government in Duval County.

Wilson v. Crews, (1948) 34 So.2d 114, cited by plaintiffs, does not hold to the contrary. In that case the later amendment not only involved the same subject matter but also the same section of the constitution. There the court found in the later provision "an intent to revise the fundamental law governing the establishment of Justice Districts."

In some respects the question raised here is analogous to the question of whether a later general law repeals a prior special act. It is settled that a general act does not repeal or modify an existing special act unless the general act is a complete revision of the whole subject or unless the two acts are so irreconcilable as to clearly demonstrate a legislative intention to repeal. Sanders v. Howell, 73 Fla. 563, 76 So. 802 (1917); Stewart v. DeLand-Lake Helen Special Road and Bridge District, (1916) 71 Fla. 158, 7 So. 42; Apalachicola v. State, (1927) 93 Fla. 921, 112

So. 618. By the same reasoning a later general provision of the constitution does not impliedly repeal a prior one of special application unless the two provisions are utterly inconsistent and repugnant to each other.

The two provisions under consideration here are entirely consistent and easily reconciled with one another. The consolidation amendment is not self-executing. Until it was implemented by legislative action, Duval County retained its county government and was governed by article VIII, §5, as that section existed both before and after 1944. The consolidation amendment is a special provision applying only to Duval County and giving the legislature power at any time to consolidate the county and the cities within it into a municipality.

Plaintiffs' original argument in favor of a contrary intent was based on the proviso at the end of the 1944 amendment. This proviso made it clear that the amendment did not affect article VIII, §11, which plaintiffs' complaint describes as "the Dade County Home Rule Charter Provision". Plaintiffs say that the lack of a similar provision, saving the Jacksonville consolidation amendment, indicates an intention to repeal it. The fallacy of this argument is apparent from an examination of article VIII, §11, as it existed in 1944. While that section now provides for home rule in Dade County, it contained no such provision in 1944. At that time, it related solely to commissioners' districts and the terms of office of Dade County commissioners. Thus, it dealt with exactly the same subject matter as article VIII, §5. Because the two sections had a common subject, a saving clause was needed when §5 was amended in 1944. Because the amendment to article VIII, §5, has no relation to the Jacksonville consolidation section, no saving clause was required. The absence of a saving clause does not show an intention to repeal the consolidation amendment any more than any other unrelated section of the constitution. It was not until 1956, some twelve years later, that the Dade County home rule provisions were incorporated into article VIII, §11.

I conclude, therefore, that the consolidation amendment was not repealed and that it was effective to authorize the legislature to enact a charter in accordance with its terms.

### The charter of the consolidated government

The charter creates a single governmental unit which extends throughout the entire area of Duval County. It consolidates the former county government, the cities of Jacksonville, Jacksonville Beach, Neptune Beach, Atlantic Beach and the town of Baldwin,

and certain other districts and authorities described in article 1 (referred to in the charter as "the former governments") into a single body politic known as the city of Jacksonville. Under the charter the new government succeeds to all of the properties and privileges of the former governments and becomes subject to all of their rights, obligations and duties as of the effective date. The consolidated government has all the powers which may be exercised by a municipality and also the powers conferred on counties by Florida law. It has all the powers of the former governments. For purposes of general law, it constitutes both a county and a municipality. Under §3.01, the consolidated government may exercise all of its powers throughout Duval County.

The powers of the consolidated government are divided among its legislative, executive and judicial branches. All legislative power is vested in a council of nineteen members, five of whom are elected from districts which must be re-apportioned by the Jacksonville-Duval Area Planning Board within six months after the publication of each federal census.

Executive power is exercised by the mayor, and by various departments and boards created by the charter. The director of each department is appointed by the mayor subject to confirmation by the council. The council may create, combine or terminate any one or more of the various departments.

The charter retains the court system formerly existing in the county except that the county judge no longer issues licenses other than marriage licenses, and a single municipal court is created having jurisdiction throughout the county.

The charter places the entire consolidated city into a general services district made up of the entire county and also creates five urban services districts. The consolidated government is required to furnish certain basic services in the general services district and additional services in the urban services districts. The charter does not prevent the consolidated government from furnishing additional (unspecified) services in any of the districts.

Initially, the urban services districts include the areas within the former limits of the municipalities of Jacksonville, Jacksonville Beach, Neptune Beach, Atlantic Beach and Baldwin. The council may by ordinance expand the first urban services district (Jacksonville) when it is able to provide substantially the same urban services to the new area as it provides in that district. The council may by two-thirds vote consolidate all five urban services districts or any two or more of them subject to approval by a majority of the voters in the districts affected.

Although the consolidated government may exercise all of its powers throughout Duval County, the Beaches and Baldwin urban services districts will retain their former governments and will be entitled to use the property received from them by the consolidated government and to deal with it on behalf of the consolidated government. Although these urban services districts retain their former governments, nothing in the charter restricts the power of the consolidated government to impose taxes and to adopt ordinances which apply in those districts. The consolidated government is required under §2.05 of the charter to provide the various services listed in that section to all urban services districts, including those which will retain their previous forms of government.

The consolidated government is given the power to levy and collect ad valorem taxes throughout the entire general services district to finance the general services which it furnishes.

On the effective date of the charter, the consolidated government becomes subject to all the duties and obligations of the former governments, and all outstanding bonds issued by the former governments become obligations of the consolidated government; however, care has been taken to insure that payment of these obligations and the interest on them will be made solely out of funds derived from the same sources from which payment would have been made had the charter not become effective. The charter provides that if the first urban services district is expanded, future tax levies will not include items for the payment of preexisting general obligation bonds issued by the first urban services district prior to the date the area became a part of the first urban services district. The charter also provides that if any urban services districts are consolidated the tax levies on property formerly included in one shall not include any item for the payment of obligations issued by the others.

The manifest intention of the legislature in enacting the charter was to merge all of the former governments into a single consolidated government patterned after the recommendations of the Local Government Study Commission. The resulting government has broad home rule powers, including all of the powers and obligations of the county commission and all of the powers and obligations of the former municipalities within its boundaries.

### Constitutional provision

The legislature enacted the charter under the authority contained in article VIII, §9 of the constitution, which provides —

*Legislative power over city of Jacksonville and Duval County.* — The Legislature shall have power to establish, alter or abolish, a Municipal

corporation to be known as the City of Jacksonville, extending territorially throughout the present limits of Duval County, in the place of any or all county, district, municipal and local governments, boards, bodies and officers, constitutional or statutory, legislative, executive, judicial, or administrative, and shall prescribe the jurisdiction, powers, duties and functions of such municipal corporation, its legislative executive, judicial and administrative departments and its boards, bodies and officers; to divide the territory included in such municipality into subordinate districts, and to prescribe a just and reasonable system of taxation for such municipality and districts; and to fix the liability of such municipality and districts. Bonded and other indebtedness, existing at the time of the establishment of such municipality, shall be enforceable only against property theretofore taxable therefor. The Legislature shall, from time to time, determine what portion of said municipality is a rural area, and a homestead in such rural area shall not be limited as if in a city or town. Such municipality may exercise all the powers of a municipal corporation and shall also be recognized as one of the legal political divisions of the State with the duties and obligations of a county and shall be entitled to all the powers, rights and privileges, including representation in the State Legislature, which would accrue to it if it were a county. All property of Duval County and of the municipalities in said county shall vest in such municipal corporation when established as herein provided. The offices of Clerk of the Circuit Court and Sheriff shall not be abolished but the Legislature may prescribe the time when, and the method by which, such offices shall be filled and the compensation to be paid to such officers and may vest in them additional powers and duties. No county office shall be abolished or consolidated with another office without making provision for the performance of all State duties now or hereafter prescribed by law to be performed by such county officer. Nothing contained herein shall affect Section 20 of Article III of the Constitution of the State of Florida, except as to such provisions therein as relate to regulating the jurisdiction and duties of any class of officers, to summoning and impanelling grand and petit jurors, to assessing and collecting taxes for county purposes and to regulating the fees and compensation of county officers. No law authorizing the establishing or abolishing of such Municipal corporation pursuant to this Section, shall become operative or effective until approved by a majority of the qualified electors participating in an election held in said County, but so long as such Municipal corporation exists under this Section the Legislature may amend or extend the law authorizing the same without referendum to the qualified voters unless the Legislative act providing for such amendment or extension shall provide for such referendum.

Plaintiffs contend on a multitude of grounds that the charter as a whole is defective. These will be discussed separately in some instances and in groups where the legal issue is identical.

In State v. Lee, 166 So. 249 (Fla. 1936), the Supreme Court stated —

Since the state courts, in dealing with the question of the constitutionality of an act of the Legislature, are entitled to take judicial notice of all local factual considerations apparent to the legislative department of the state government out of which the impulse for its enactment in

a particular form arose (Dominion Hotel, Inc. v. Arizona, 249 U.S. 265, 39 S.Ct. 273, 63 L.Ed. 597), we proceed now to a consideration of the validity of Florida chapter 16848, Acts of 1935, in the light of the following circumstances of which this court may properly take judicial notice as having entered into the consideration concerning, and as having influenced the passage of, the challenged law . . .

Therefore, in determining the constitutionality of the charter as passed by the legislature, this court has given due consideration to the facts of which it has taken judicial notice and which were established by the evidence.

### Constitutionality presumed

As we proceed to a discussion of the legal issues, one must remain aware that (1) we have constitutional authority granting the legislature power to consolidate, (2) a charter created and passed by the legislature and (3) overwhelmingly approved by the voters. The legislature has wide latitude in exercising its functions under the constitution. Its determinations carry a presumption of validity, and they will not be set aside unless they are defective beyond all reasonable doubt. The Supreme Court made this clear in Gray v. Golden, (1956) 89 So.2d 785, a case very similar to this one where the court wrote —

> Another thing we should keep in mind is that we are dealing with a constitutional democracy in which sovereignty resides in the people. It is their Constitution that we are construing. They have a right to change, abrogate or modify it in any manner they see fit so long as they keep within the confines of the Federal Constitution. The Legislature which approved and submitted the proposed amendment took the same oath to protect and defend the Constitution that we did and *our first duty is to uphold their action if there is any reasonable theory under which it can be done.* This is the first rule we are required to observe when considering acts of the Legislature, and it is even more impelling when considering a proposed constitutional amendment which goes to the people for their approval or disapproval. (Italics added.)

### Miscellaneous constitutional provisions

Plaintiffs contend that the charter violates various other provisions of the constitution. These include article III, §16, by embracing more than one subject; article III, §20, by attempting in special legislation to regulate duties of a class of officers other than municipal officers; article VIII, §1, by attempting to abolish a county; and article IX, §16(c), and article XII by transferring to the city duties of the county commissioners with respect to gasoline taxes and school funds.

These contentions might well be persuasive if the consolidation amendment had been repealed, but since it is still in effect they have no merit.

Similar contentions were made by opponents of the Dade County Home Rule Amendment in Gray v. Golden, supra. In that case the plaintiffs contended that the amendment would have the effect of revising more than one article of the constitution contrary to article XVII, §1. The circuit court sustained the objections but, on appeal, the Supreme Court reversed, pointing out that the proposed amendment dealt with a single subject matter, "home rule for Dade County", and that it was entirely proper for particular sections of the constitution to limit others "in order to accomplish the specific purpose for which they were designed."

As is further stated by Justice Terrell in Gray v. Golden, supra —

> We do not controvert the fact that when read in isolation provisions of the proposed amendment may appear conflicting and contradictory but when read in relation to other pertinent provisions, there is ample reason to dissolve the alleged conflicts.
>
> \* \* \*
>
> Unity of purpose as revealed in the object sought by the amendment is the test; the details leading to it are not material.

The determination and opinion of the Supreme Court in Gray v. Golden, supra, also disposes of the other alleged conflicts asserted by the plaintiffs not discussed specifically in this judgment.

Inasmuch as the consolidation amendment specifically authorized the legislature to devise a charter creating a consolidated government, a charter enacted in accordance with that section does not violate any other general provisions of the constitution, nor does the charter amend or revise any general law dealing with the offices in Duval County which are abolished. Under the charter the consolidated government is a county or a municipality for all purposes of general law. Therefore, it succeeds to Duval County's right to receive gasoline tax moneys and state school funds, and it has the same duties with respect to them as Duval County has.

### Beaches and Baldwin

Plaintiffs contend that the charter does not comply with the consolidation amendment because the urban services districts into which the municipalities of Jacksonville Beach, Neptune Beach, Atlantic Beach and Baldwin are converted are allowed to retain their former governments. Plaintiffs contend that this is improper because it creates four municipalities within a municipality. This contention is without merit.

The consolidation amendment gives the legislature power "to establish . . . a Municipal corporation to be known as the City

of Jacksonville, extending territorially throughout the present limits of Duval County in place of *any or all* . . . municipal and local governments . . .". (Italics added.)

In Wilson v. Crews, (1948) 34 So.2d 114, cited by plaintiffs for another point, the Supreme Court quoted an earlier case, saying —

> It has been said that, as statutes are hastily and unskillfully drawn, they need construction to make them sensible, but constitutions import the utmost discrimination in the use of language, that which the words declare is the meaning of the instrument.

The provision of the consolidation amendment quoted above clearly contemplates that the consolidated city government will extend throughout the territory, but that one or more municipal or local governments in the territory may continue in existence. Continuation of quasi municipal corporations appears to be well within the amendment.

The consolidation amendment also authorizes the legislature "to establish subordinate districts." That is what the legislature did in the charter. It designated the areas which were formerly within the municipalities of Jacksonville Beach, Neptune Beach, Atlantic Beach and Baldwin as urban services districts.

The term "district" is not defined in the constitutional provision. It is susceptible of many meanings. Some of these are indicated in 27 C.J.S., *Districts,* p. 618:

> The term "districts" is defined as meaning a division of territory made for administrative, electoral, or other purposes; a defined portion of a state, county, town, borough, or city for legislative, judicial, fiscal or election purposes; a special geographical area over which specific authority, executive, legislative, or judicial is exercised by properly constituted officers; . . .

It is not unusual in Florida for districts to have governing bodies, the power to tax, the power of eminent domain and various other powers enjoyed by municipal corporations. Under the constitutional provision the legislature had wide latitude in determining the characteristics of districts to be included in the consolidated government. Under the first sentence of the constitutional provision the retention of their former governments does not prevent them from being districts.

It also appears that the districts are "subordinate". The consolidated government has the power to tax and to enact ordinances operative throughout the county, to render services in those urban services districts, and to consolidate them subject to referendum by the voters. Under the circumstances, I conclude that the legislature

was authorized to permit the Beaches and Baldwin to retain their former governments subject to the controlling provisions of the charter.

## Equal protection of the laws

Plaintiffs contend that the legislature violated the equal protection doctrine embodied in §1 of the Declaration of Rights of the Florida constitution and in the 14th amendment to the United States constitution by (a) permitting the residents of the Beaches and Baldwin to retain their former governmental structures while denying this right to residents in Duval County and the old city of Jacksonville, and (b) permitting electors in the Beaches and Baldwin to vote for officers of the consolidated government.

Needless to say, the Beaches and Baldwin are located in outlying areas of Duval County. The equal protection clause is not violated by reasonable classifications having a substantial relation to the purpose of the legislation. The legislature could reasonably determine that the local problems in those urban services districts could be met more effectively if those districts were allowed to retain their former governments upon the terms specified in the charter. No evidence has been adduced that the classification was arbitrary and capricious; consequently, it must be upheld.

By the same token, the equal protection clause was not violated by permitting electors in those urban services districts to vote for officers of the consolidated government. The consolidated government is their government. It has the power to pass ordinances affecting them, to consolidate them (subject to referendum), to levy ad valorem taxes upon them for general services purposes. The only limitation upon its powers is that it may not levy ad valorem taxes for urban services. The cost of any urban services rendered by the consolidated government in those districts must come from other sources of revenue.

Under the circumstances, the equal protection clause is not violated by permitting electors in the Beaches and Baldwin to vote for officers of the consolidated government. Indeed, they would be subject to taxation without representation and, thus, deprived of equal protection if this right were denied.

## Impairment of contracts

Plaintiffs contend that the charter will impair the contracts and obligations of the former governments in violation of the state constitution. The answer to this contention is in the charter itself. Under §1.01, the consolidated government becomes "subject to all of the liabilities, obligations and duties of the former govern-

ments from and after the effective date of this Charter". Section 16.01 provides that all outstanding bonds issued by former governments "are obligations of the consolidated government; however, payment of such obligations and the interest thereon shall be made solely from and charged solely against funds derived from the same sources from which such payments would have been made had this Charter not become effective."

The charter does not affect either the rights or remedies of the creditors of the former governments. It does not impair the obligations of those former governments in any respect. Its provisions for creditors are substantially the same as those approved by the Supreme Court in State ex rel. Johnson v. Goodgame, 108 So. 836 (Fla. 1926). Consequently, plaintiffs' contentions have no merit.

## Rural lands included in municipality

Plaintiffs contend that the charter is invalid because the municipal corporation extending throughout the county includes rural lands. The answer to this is found in the third section of the consolidation amendment which permits the legislature to determine what portion of the municipality is a rural area for homestead purposes. Certainly, it would be improper to tax rural property for services which do not benefit the rural areas. State ex rel. Landis v. Boynton Beach, 129 Fla. 528, 177 So. 327 (1937). That is the apparent reason for the determination of the legislature to divide the county into a general services district and several urban services districts. Under the scheme of the charter, as contemplated by the consolidation amendment, the county is classified for tax purposes in accordance with the services actually rendered by the city to each particular area, and the taxpayers in each area bear the cost of only those services which are furnished to them. If the legislature had not classified the areas of the city into districts, plaintiffs' contention might have merit. It is not persuasive in the context of the consolidation amendment and the present charter.

## Apportionment of council districts

Plaintiffs contend that the council districts are unfairly apportioned and that the charter as a whole is therefore invalid. The boundaries of the council districts are contained in the charter. They were drawn by the legislature from 1966-1967 population estimates made by the Jacksonville-Duval Area Planning Board. The estimates were made according to generally accepted techniques used in making estimates of population, and there is no evidence that they were not substantially correct. No other evidence has been offered of the present population of the council districts.

Plaintiffs based their contention of malapportionment on the legislature's use of current population estimates instead of the population figures shown in the 1960 decennial census. Plaintiffs contend that use of the last decennial federal census was required by article VII, §5, of the constitution and §11.031, Florida Statutes. The constitutional provision cited by plaintiffs eliminated a former provision of the constitution which required the state to make a decennial census. The new provision provides that the legislature is no longer required to do this and that the last preceding federal census shall be the state census and "shall control in all population acts and constitutional opportionments, *unless otherwise ordered by the legislature.*" Section 11.031, Florida Statutes, provides that no "special city, county or district census shall be effective for any purpose . . .".

In their attack on the charter plaintiffs contend that the use of current population estimates was a violation by the legislature of these provisions. If plaintiffs' contention were accepted the effect would be to hold a legislative act invalid because the legislature did not conform to a prior act which the legislature itself had passed in a case where the only constitutional provision invoked expressly gives discretion to the legislature. The constitutional provision and the statute are both intended to provide a means for determining definitely when various population acts apply. They also govern when reapportionment is needed under article VII of the constitution or when county commissioners reapportion their districts under article VIII, §5. Needless to say, the legislature is authorized under article VII, §5 to use population figures other than the last federal census if in its judgment current figures would create a more equal apportionment.

The propriety of the legislature's use of current figures was demonstrated at the hearing. There have been substantial shifts of population in Duval County since 1960. If the 1960 census figures were applied to the council districts as drawn by the legislature, the variation would be as high as 24% above the average and as low as 36% below the average. Using current figures the maximum variation is only 11.82%, well within the federal guidelines. Toombs v. Fortson, 241 F.Supp. 65, U.S.D.C., N.D. Ga.: 1965, affirmed without opinion, 384 U.S. 210; Swann v. Adams, 263 F.Supp. 225, U.S.D.C., S.D. Fla.: 1967.

If plaintiffs' contention were accepted and reapportionment were ordered on the basis of the 1960 census figures, this court would be in the incongruous position of not only setting aside an act of the legislature which was authorized by the constitutional provision involved but also ordering a reapportionment which

would violate the federal constitution as interpreted in recent Supreme Court cases. Plaintiffs cite Swann v. Adams, 263 F.Supp. 225 (1967), a reapportionment case in which a three-judge court accepted 1960 census figures as meeting the *minimal* federal requirements in the absence of more reliable population data. Needless to say, there is a vast difference between (a) using 1960 census figures in a reapportionment case to draw new district lines when those figures are the best available and (b) using 1960 census figures to attack an apportionment made by the legislature from reliable current population estimates, especially in a case where substantial population shifts have occurred since 1960.

Because the only current figures now available are those used by the legislature, no purpose would be served in ordering reapportionment or striking down the charter. In any event, reapportionment will automatically occur under §5.02 of the charter as soon as the 1970 federal census figures become available. I conclude that plaintiffs' attack on the apportionment of council districts has no merit.

### *Form of amendments*

Plaintiffs contend that the amendments to chapter 67-1320 contained in chapter 67-1535 and chapter 67-1547 violate the last portion of article III, §16, of the Florida constitution, which requires amendments of sections, subsections and paragraphs of such subsections to be re-enacted at length. This provision of the constitution has been construed in four cases, Lipe v. City of Miami, (1962) 141 So.2d 738; Auto Owners Insurance Co. v. Hillsborough County Aviation Authority, (1963) 153 So.2d 722; Massachusetts Bonding and Insurance Company v. Bryant, (1965) 175 So.2d 88; and Webster v. North Orange Memorial Hospital Tax District, (1966) 187 So.2d 37.

The *Lipe* case involved the validity of an amendment to the charter of the city of Miami relating to the civil service system. The amendment added a new subparagraph (c) to an existing section. Without any introduction, the subparagraph listed certain job titles. The parent section of the original act began with language making it clear the jobs listed in the section were "unclassified". Although it could not be determined from the language of the amendment, the effect of the amendment was to categorize the positions listed in the new subparagraph (c) as unclassified jobs in which civil service rights did not accrue. The effect of the amendment on the civil service rights of the employees in the listed jobs could not be determined from the amendment itself. The court held that the test of compliance with article II, §16,

was whether the amendment is intelligible in itself without "reference" to the act it purports to amend.

In the *Auto Owners* case suit was brought on a contractor's bond given pursuant to chapter 255, Florida Statutes. The defendant relied upon a one-year statute of limitations contained in an amendment which added a second subsection to §255.05. The subsection which was added required persons supplying labor or material to give notice to the contractor within 90 days after performance of the work or delivery of the materials. The section had not previously contained any statute of limitations. The new section also contained a one year statute of limitations on "the surety bond required in this section". The provision requiring the surety bond and specifying its purpose was in the first subsection of the section which was not republished in the amendment. Under the circumstances the amendment referring to the bond made no sense without republication of the entire section. The court followed the *Lipe* case and held that the amendment violated article III, §16.

Under these cases when is the constitutional provision violated? In *Lipe* the court took care to point out that it should overthrow only such acts "as clearly offend the *spirit* and *meaning* of the Constitution." (Italics added.) It further observed —

> We further feel constrained to point out to all concerned that the language used here to describe the contemplated evils by the last portion of Section 16, Article III . . . should be strictly limited to the facts of this case, keeping ever in mind that each succeeding case must of necessity stand or fall upon the language of the statutory revision or amendment involved. If the statutory enactment is complete and intelligible in itself without reference to the act it purports to amend, Article III, §16, of the Constitution of the State of Florida is satisfied.

The two cases do not say how much "reference" is required to the original statute for a violation of article III, §16 to exist. The explicit terms of the constitutional provision contemplate that in a proper case reenactment of a single paragraph of a sub-section is sufficient. Speaking literally, no paragraph, section or group of sections has meaning without some reference to the act which is being amended. If the constitutional provision were construed to require republication whenever *any* reference is required it would be unworkable. Every act would have to be restated in its entirety for an amendment to be effective. Needless to say, this is not necessary. The draftsman of an act may assume that members of the legislature are acquainted with the general purpose of the original act, with its over-all framework, with the manner in which the section fits into that framework, and with the meaning of any defined terms in the legislation.

The facts in *Lipe* and *Auto Owners* demonstrate what is meant by "reference" and provide a guide for deciding when more than the actual amended language must be republished to comply with the constitutional mandate. In both of those cases the effect of the amended section itself could not be understood without reference to the original act. Under the circumstances, I conclude that when a section, sub-section or paragraph is amended enough of the act being amended must be republished to make the meaning of the provision published intelligible from its language and to insure that no unexpected meaning results from the combination of that language and other language in the act.

The *Webster* case which was a bond validation case confirms this reasoning. Chapter 59-1657 had created a special hospital district in Orange County. The chapter was a comprehensive act establishing the district, describing the territory covered by it, creating a board of trustees, enumerating their powers and giving them the power to operate hospitals, borrow money and issue bonds. Section 8 of the act provided for a referendum election to authorize the issuance of bonds to construct a hospital. These were to be general obligations of the district. The bonds were not issued and no hospital was constructed. Later, chapter 63-1701 was passed. It amended only §7 of the original act, which had authorized the trustees to borrow $20,000 and to issue "notes". The single section of chapter 63-1701 amended §7 to authorize the issuance of revenue bonds. At the next session of the legislature chapter 65-2003 was passed. It purported to amend chapter 63-1701, although its actual effect was to amend §7 of the original chapter, 59-1657. The original chapter was not mentioned in the amending act. A single section was republished to amend the terms of the bonds which the trustees were authorized to issue. The section described the trustees only as "the board of trustees". The name of the taxing district did not appear in the bill. The only reference to it was in the title of the act. The latest amendment was attacked on the ground that it violated article III, §16 of the constitution because it was not intelligible without reference to the original act. The Supreme Court rejected the contention using the following language and citing *Lipe* and *Auto Owners* as authority —

> As to Chapter 65-2019, amended by reference to title only, or without republication of the basic Act, this Statute we find to be complete, coherent, and intelligible when read in isolation so that it is not necessary to refer to the books in order to relate it to the Chapter amended or Chapter 59-1657.

An examination of the various amendments to the charter in light of this test case makes it clear that most of them stand on

their own feet. They are intelligible by themselves without more than a knowledge of the general purpose and framework of the charter. This is demonstrated by an examination of each amendment individually —

## CHAPTER 67-1535

Section 1 of this chapter contains sixteen subsections. Subsection 1 is a complete revision of article 2. It is set out in full, and it is completely intelligible. Subsection 2 includes an entirely new article 2A. It, too, is fully set out and is not subject to successful attack.

Subsection 3 adds a new §5.14 to article 5. This section merely provides that the auditor shall have no duties concerning the accounting systems of the Beaches and Baldwin (urban services districts which are referred to at length in article 2A.), and the council shall not be required to provide an independent audit of those districts. No reference to the parent chapter is required for this section to make sense.

Subsection 4 amends in full the first paragraph of §15.02. It provides that the budget of the consolidated government shall be divided into three sections. One of these will cover the general services district, the second will relate to services performed in the first urban services district, and the third to the services rendered in the other urban services districts. These districts are described in the restatement of article 2 and in article 2A, both of which are restated in the amending act itself. The amendment standing alone is intelligible.

Subsection 5 amends the second paragraph of §15.06. It provides for an annual tax levy on real and personal property in the first urban services district in an amount which, together with other income, will finance the total appropriation for that urban services district. This paragraph (with reference to articles 2 and 2A which are restated in the amending act) is complete in itself.

Subsection 6 adds an additional §15.09 to article 15. Even though this section refers to other provisions of article 15, its meaning is explicit without reading those provisions. The second sentence fully explains its intent, which is not altered by any terms in the original act. The section provides that the budgets of the Beaches and Baldwin and the levy of taxes in those districts shall be in accordance with the special and general laws which applied in those districts immediately prior to the effective date of the charter.

Subsection 7 amends the last sentence of §16.03. Here, although admittedly the entire section is not set out, the meaning of the amendment is entirely clear without resort to the basic charter. The sentence provides that bonds payable for ad valorem taxes shall be obligations of the entire general services district unless the council determines that their proceeds will be used primarily for the benefit of the first urban services district or other taxing district which is to be obligated for their payment.

Subsection 8 amends the last sentence of §16.04. Here again, although the entire section is not set out, the amendment is clear. It provides that only freeholders residing in the first urban services district shall be entitled to vote on ad valorem bonds which are obligations of that district.

Subsection 9 adds an entirely new §16.09 to article 16. It provides that if ad valorem taxes are pledged to secure bonds issued by the former governments of the Beaches and Baldwin, taxes for their payment shall be levied by the governments of those districts, and that those governments may continue to issue bonds without authorization by the council. Here, too, the section by itself makes sense.

Subsection 10 amends the second section of 17.01 to read as follows —

All officers who are required by this charter to be elected (except as provided in *Section 2A.02 and 14.04* and Article 13 hereof) shall be elected at the general consolidated government elections.

Understanding this amendment does require resort to other sections. A comparison of the language of the original act and the amendment shows, however, that the only change made was the addition in the exception clause of the words "Sections 2A.02 and 14.04". The reference to section 2A.02 is not a defect since that section is set out in chapter 67-1535, itself. Section 14.04 is in the basic charter, but if the reference to it were removed from the exception the meaning of the charter would not be altered. Section 14.04 is a specific provision providing the dates on which members of the board of public instruction will be elected.

Subsection 11 amends §17.09 in full. It relates to costs and expenses of elections provided for in the charter; it is complete in itself.

Subsection 12 adds an entirely new section, 18.04, which continues in effect all retirement and pension plans for the former governments of the Beaches and Baldwin. No reference to the charter is required to understand the meaning of this amendment.

Subsection 13 contains an entirely new §19.10, making it clear that the civil service systems existing in the governments of the Beaches and Baldwin are to be determined in accordance with §2A.05, which is in chapter 67-1535 itself.

Subsection 14 adds a new §20.10, providing that rules relating to the conduct of officers and employees of the Beaches and Baldwin shall be determined in accordance with §2.05 of the charter. Here again, no reference to any other act is required.

Subsection 15 adds a new §21.06, the effect of which is to provide that matters of planning, land use and zoning in the Beaches and Baldwin will be determined under the former governments. Here again, the amendment is self-explanatory.

Subsection 16 amends subsection E of §22.11 to provide that the budgets of the former municipalities of the Beaches and Baldwin shall continue for the fiscal year beginning January 1, 1968, through December

31, 1968, but on August 1, 1968, they shall become the budgets of the urban service districts into which those municipalities were converted. The subsection also permits the budgets in those districts to be on a calendar year basis. No reference to anything outside of chapter 67-1535 is required to understand this provision.

## CHAPTER 67-1547

Section 1 of this chapter amends the boundaries of the council districts setting them out in full. No reference to the basic charter is required to understand the effect of the amendment.

Section 2 purports to amend the charter to strike the words "urban renewal" from §23.04. Here, it must be admitted that reference to the basic charter may be required to understand the meaning of this amendment; therefore, this amendment could well violate article III, §16. However, as pointed out below there is no need to reach this question now. The only issue now before the court is the validity of the charter as a whole and whether any defects are so serious that they cannot be severed without making the charter unworkable.

In Dade County v. Dade County League of Municipalities, 104 So.2d 512 (Sup. Ct. Fla. 1958), the court stated —

We limit our consideration of the problem entirely to a determination of whether the proposal in its entirety contravenes the provisions of Article VIII, Section 11, Florida Constitution. We have used the word "entirety" advisedly. When a proposal of the nature here involved is assaulted on the ground that it violates the Constitution, the courts will not interfere if upon ultimate approval by the electorate such proposal can have a valid field of operation even though segments of the proposal or its subsequent applicability to particular situations might result in contravening the organic law.

Section 3 provides that the amendments to the charter in chapter 67-1547 will become part of the charter subject to the referendum as provided in the charter except that the ballot shall read —

Shall there be a consolidated government extending throughout the territorial limits of Duval County to be named the City of Jacksonville, pursuant to the provisions of Section 9, Article VIII, of the Constitution of the State of Florida, as provided by House Bill 3029, Laws of Florida, Regular Session 1967, as amended? Yes___ No___.

The only amendment in this section is in the language of the ballot to add the words "as amended". The wording to be used in the ballot is set out in its entirety; consequently, detailed reference to the original charter is not required.

Sections 4 through 12 and §14 amend various sections of the charter to add the words "or commensurate training or experience" in describing the qualifications required of the various department heads. Some of these amendments are intelligible without reference to the charter. But some, for example §§9, 10 and 11, may not be.

Section 13 provides that the director of public safety may shift employees from the "second fire protection division" to the "first fire protection division" where necessary to effect a sufficient administration of the stations in the expanded territorial limits. This amendment may or may not be intelligible without reference to the basic charter.

While a very limited number of the amendments may be defective another factor which was not present in *Lipe* and *Auto Owners* is pertinent here. Chapters 67-1535 and 67-1547, the two amendments of the original act which are under attack in this proceeding were passed at the same session of the legislature within nineteen days after passage of the basic charter. The latest of the two amendments, chapter 67-1547, was introduced in the Senate only 14 days after the basic charter had been sent to the Governor for signature. All three acts resulted in one charter and were the culmination of a single continuing process of legislation. Under these circumstances it is highly unlikely that the members of the legislature were confused. The dangers which the constitutional provision was intended to protect against did not exist. Even if some amendments did not meet the test, justification may well exist under the particular circumstances for a more liberal application of article III, §16. But for the reasons discussed below that question need not be decided in this case.

It is settled in this state that a plaintiff attacking the validity of a statute cannot object to any part of the statute which does not directly affect him unless its invalidity so pervades the act as to render it unconstitutional in its entirety. McSween v. State Livestock Sanitation Board (1929) 97 Fla. 750, 122 So. 229, 65 A.L.R. 508. Even if several minor amendments in chapter 67-1547 violate article III, §16, the plaintiffs cannot challenge them unless the defective amendments directly affect them or are so fundamental as to violate the entire act.

None of the plaintiffs is alleged to reside in any of the municipalities which retain their former governments. Since chapter 67-1535 deals solely with the Beaches and Baldwin the amendments in this chapter do not affect them.

Plaintiffs are likewise unaffected by any of the amendments in chapter 67-1547. Under these circumstances they may question the validity of the amendments only if their elimination would invalidate the entire charter.

Elimination of the amendments which may be defective does not invalidate the entire charter. It is settled that even if a statute contains no severability clause, the invalidity of a part of the statute does not destroy the whole so long as the remaining portion can

stand as a valid expression of the legislative will. In State v. Calhoun County, (1936) 127 Fla. 304, 170 So. 883, it was held that where as here the act contains a severability clause, courts should be even more reluctant to strike down the entire act. State ex rel. Lane Drug Stores v. Simpson, (1935) 122 Fla. 582, 166 So. 227; Lewis K. Liggett Co. v. Lee, (1933) 109 Fla. 477, 149 So. 8; State ex rel. Lane Drug Stores v. Carswell, (1935) 122 Fla. 639, 166 So. 249, aff'd on rehearing, 122 Fla. 700, 166 So. 262; Dade County v. Keyes, (1962) 141 So.2d 819. In the language of the *Liggett* case, these provisions serve notice on the courts of "a legislative intent that separable portions of an act would have been eliminated if the Legislature had been advised of this invalidity."

The amendments which may be invalid relate solely to minor matters, including whether the consolidated government will have the power of urban renewal, whether "commensurate training and experience" will supply deficiencies in the qualifications otherwise required of department heads and similar matters. In determining whether defective provisions destroy an entire act the question is whether if the defective portion were eliminated, the remainder would carry out the manifest purpose of the law-making authority. The minor nature of the defective amendments combined with the severability clause contained in §23.07 of the charter makes the answer to this question clear.

The fundamental purpose of the legislature in enacting the charter and its amendments was to provide a consolidated municipal government in Duval County. This purpose was expressed in chapter 67-1320 which stood alone as the charter until the amendments were passed. Most of the amendments are clearly in proper form. Some may be defective. If the proper amendments are incorporated without those which may be defective the charter is in no way distorted. The amendments which may be defective are minor ones. They do not alter the fundamental purpose of the charter or make it unworkable. From this fact and from the legislative intent expressed in the severability clause, I conclude that any of the amendments which may be defective do not render the charter invalid.

The question remains whether I should decide in this proceeding the validity of the various amendments to the charter. Because the amendments do not directly affect plaintiffs, they have no standing to attack them. 6 Fla. Jur., *Constitutional Law*, §60, et seq. It is conceivable that these amendments may never be attacked by persons having proper standing. If they should be challenged, it will be in the context of facts which will facilitate a proper

decision in light of the particular amendment under attack. Without an interested party and without the proper development of a factual context, a present determination of which amendments are invalid would be entirely hypothetical. In Frazier v. Carr, (1962) 360 S.W.2d 449, the Supreme Court of Tennessee was dealing with a somewhat similar attack on a charter consolidating the city of Nashville and Davidson County. Having upheld the charter, it held that attacks on minor provisions of it were premature. It wrote —

> Certain other objections, some not raised in the assignments of error, to the Metropolitan Charter are made in one or the other of the appelants' briefs. They are objections which do not affect the constitutionality of the Metropolitan Charter. If such objections therefore are well taken, they may be taken care of by elision. The Charter provides for elision.

> They should not, therefore, be considered until an individual interested personally in a particular provision affecting him or her raises the question as to that particular provision. This is made clear by Davidson County v. Elrod, 191 Tenn. 109, 110, where at page 114, 232 S.W.2d 1, at page 3, that "whether those provisions must be elided should await a case in which" a proper party should raise the question; that until then such question should be pretermitted. The Chancellor held that until then such question would be premature. This Court so agrees, as above indicated.

Under the circumstances I conclude that the validity of particular amendments to the charter should not be decided in this proceeding.

### Notice of referendum

Plaintiffs complain that the legislature violated the constitution by not giving proper notice in connection with the referendum by which the charter was approved by the voters. The notice provided for in article III, §21 was not required because the charter was approved in a referendum by the voters in the territory affected. All the voters of Duval County were permitted to vote on the charter as a whole. The voters residing in Jacksonville Beach, Neptune Beach, Atlantic Beach and Baldwin were allowed to vote separately on the question of whether they should be allowed to retain their former governments. The three acts were incorporated into one charter which was submitted to the voters. Notice of the referendum was published as required by the charter, and the ballot required by the election law was likewise published.

Plaintiffs contend that the notice was defective because the legislature amended the charter before the referendum without giving any additional notice and because the last amending act, although it had been passed some four weeks before the referen-

dum, did not become effective until August 4, 1967, four days before the referendum and after the ballots had been published as required by law. These circumstances do not affect the validity of the referendum. All the acts had been passed and their provisions were widely publicized well before the referendum. Notice required by the charter was published and the fact that one of the acts did not technically become law until very shortly before the election was immaterial.

This situation is analogous to the one in Willets v. North Bay Village, 60 So.2d 922 (Fla. 1952). In that case a referendum to approve a new charter was called at a meeting of the city council attended by less than a quorum. The council's action was clearly defective. Nevertheless the charter approved at the referendum was upheld. The court said —

> It is perfectly clear that the notice given served all the purposes of a legal one. Whether it was a directory or a mandatory prerequisite to a legal election, we do not have to decide. The rule seems approved on good authority that whether mandatory or directory, informalities or irregularities which do not affect the result of an election, will not render it invalid. This is all the more true as to the expression of the popular will when that is satisfied.
>
> It is quite true that the election call, having been made by two councilmen, was not regular, but since the people got the notice and went to the polls and voted, it served the same purpose as if it had been regular.

This case is even stronger. In *North Bay Village* the call never had any validity. Here the amending act having been passed and publicized four weeks before the election finally did become law. Thus the kind of defect that existed in *North Bay Village* is not present in this case.

The legal requirements of a referendum election were prescribed in Hill v. Milander, 72 So.2d 796 (Fla. 1954). In that case, the issue was whether the question on the ballot adequately informed the electors of the proposition on which they were voting. The court upheld the description on the ballot and said —

> In numerous instances we have held that the only requirements in an election of this kind are that the voter should not be misled and that he have an opportunity to know and be on notice as to the proposition on which he is to cast his vote . . .
>
> All that the Constitution requires or that the law compels or ought to compel is that the voter have notice of that which he must decide.

I conclude that these requirements are met in this case by the publication of the notice as required by the legislature and the wide publicity given the charter, including the amendments, prior to the referendum election.

## Laches

As an affirmative defense, it has been asserted that the plaintiffs unreasonably delayed bringing this litigation and that therefore they are guilty of laches and estopped from raising questions about the validity of the charter.

Some of the significant dates are as follows — (1) the legislature completed the enactment of the charter on July 11, 1967, (2) the public approved the charter by referendum on August 8, 1967, (3) qualification of candidates for consolidated offices closed on September 26, 1967, (4) elections for mayor, 19 councilmen and various other officers were held on October 29, November 7 and December 5, 1967. The mayor was not opposed. Therefore, by September 26, 1967, the people of this community had an approved charter and an unopposed chief executive. On March 1, 1968, under charter provisions, a six month transition period commenced and the actual turn-over of the government began.

Plaintiffs waited until April 2, 1968, to qualify as candidates for the county commission and the budget commission. This was the last day on which persons could have qualified for those offices under prior law. In this way, if the charter were invalid plaintiffs would be the unopposed candidates for those offices.

Departments such as the executive, law enforcement, property assessment, zoning, and land use are well along in not only organization but operation of a consolidated government. And that government by its charter commences full operation on October 1, 1968.

In Farrington v. Flood, 40 So.2d 462 (Fla. 1949), the plaintiffs filed a suit for a declaratory decree challenging the validity of a municipal corporation. In holding that an information in the nature of a quo warranto suit was not the sole and exclusive remedy, the Supreme Court said —

> In such a case any person affected injuriously by the attempted incorporation of an area into a municipality may challenge the validity of an organization directly by bill in equity brought for that purpose; *provided the question of invalidity is raised as soon as reasonably possible, so that no element of estoppel, laches or acquiescence intervenes.*

Plaintiffs may very well be guilty of laches or estoppel in remaining silent and withholding their attacks on the charter during a period when virtually all governmental efforts of Jacksonville and Duval County were focused on making a successful transition to the new government. But since I have concluded that the charter is valid against the attacks leveled against it, there is no need to reach this issue.

*Abolition of constitutional office*

Plaintiffs contend that county commissioners are constitutional officers and that the legislature is without power or authority to abolish that office. This argument overlooks the express provision in the Jacksonville consolidation amendment to the contrary. That amendment expressly authorizes such action and the same is therefore constitutional. Dade County v. Kelly, 99 So.2d 856 (Sup. Ct. Fla. 1957).

It is therefore adjudged and decreed that the charter of the consolidated government of the city of Jacksonville is constitutional and valid against all attacks made in this suit, that plaintiffs' prayers for relief are in all respects denied, and that this cause be and the same is dismissed at the cost of the plaintiffs.